# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

HENRY CLARK,

    Defendant,

Case No. 19-40068-01-HLT

## MEMORANDUM AND ORDER

This matter comes before the court on Defendant Henry Clark's Motion for Temporary Release from Custody (ECF No. 144). On August 30, 2019, the court ordered Mr. Clark detained pending trial, and he has been in custody since. Mr. Clark now seeks temporary release pursuant to 18 U.S.C. § 3142(i) for what he contends are compelling reasons related to the recent COVID-19 global pandemic. (ECF No. 144.) According to Mr. Clark, his present status in custody poses a lethal threat to him because he is a diabetic and does not have an opportunity for social distancing. The court is sympathetic to his concerns, but Mr. Clark is not alone. COVID-19 presents serious ongoing concerns for millions of people, especially those with certain underlying medical conditions. On balance, Mr. Clark has not shown a sufficiently compelling reason that his release is necessary, particularly in light of the court's prior finding that he is a flight risk and a risk of harm to others. He has not made even a threshold showing that his proposed release plan—which relies only on isolated aspects of public health officials' recommendations while ignoring others— would necessarily better address his health concerns than if he were to remain in custody. Furthermore, his proposed release plan would likely increase the risk of harm to others. The court therefore summarily denies Mr. Clark's motion.

## I. BACKGROUND

Mr. Clark is charged with conspiring to manufacture, distribute, and possess with the intent to distribute substantial quantities of fentanyl and heroin (and derivatives thereof). He is the lead defendant in a nine-person indictment that alleges, among other things, that these controlled substances resulted in a user's death. (ECF No. 1, at 3.) On August 27, 2019, he was arrested in Chicago. On August 30, he appeared for a detention hearing in the Northern District of Illinois before Magistrate Judge Maria Valdez. She ordered him detained pending trial based on her finding that he poses a flight risk and a risk of danger to the community. (ECF No. 49-3.)

Mr. Clark is currently housed at the Leavenworth Detention Facility operated by CoreCivic, which is located in Leavenworth, Kansas. He seeks an order for temporary release from custody for what he contends are compelling reasons—namely, that he is a 43-year-old insulin-dependent diabetic, which he contends puts him at an increased risk for contracting the SARS-CoV-2 virus and developing complications from the disease it causes, COVID-19. He notes that the Centers for Disease Control and Prevention ("CDC") identifies certain categories of individuals at a higher risk of severe illness, including those with serious underlying medical conditions such as diabetes. Mr. Clark also states that his diabetes puts him at an increased risk for contracting the virus (although, as explained below, he lacks evidence to support this assertion). He also contends that he does not have the option of adhering to CDC guidelines recommending social distancing while he is incarcerated, making an outbreak likely. And he questions the facility's ability to effectively manage an outbreak. Among other things, he notes that, while incarcerated, he has reported blood-sugar levels over 300 mg/dL on multiple occasions and that medical staff have struggled to address his diabetes. He also states that his attorney contacted CoreCivic and was advised that COVID-19 testing was not currently available at the facility.

Mr. Clark proposes that the court release him to his residence in Chicago, where he previously resided with his 73-year-old mother. He states that his brother has agreed to drive from Chicago to Leavenworth to pick him up and transport him back home to Chicago.

## II. ANALYSIS[1]

Mr. Clark moves for temporary release pursuant to 18 U.S.C. § 3142(i) of the Bail Reform Act. It provides in relevant part as follows:

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary* for preparation of the person's defense or *for another compelling reason*.

§ 3142(i) (emphasis added). A defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i). *See United States v. Buswell*, No. 11-CR-198-01, 2013 WL 210899, at *5 (W.D. La. Jan. 18, 2013) (collecting cases).

Most courts addressing a motion for temporary release under § 3142(i) have done so in the context of evaluating the necessity of the defendant assisting with preparing his or her defense. *See, e.g., Buswell*, 2013 WL 210899, at *5; *United States v. Dupree*, 833 F. Supp. 2d 241, 247 (E.D.N.Y. 2011); *United States v. Jeffries*, No. 3:10-CR-100, 2011 WL 182867, at *4 (E.D. Tenn. Jan. 20, 2011); *United States v. Hazelwood*, No. 1:10 CR 150, 2011 WL 680178, at *3 (N.D. Ohio Feb. 16, 2011); *United States v. Petters*, No. CR. 08-364(RHK/AJB), 2009 WL 205188, at *2 (D.

---

[1] Pursuant to Administrative Order 2020-3, all nonemergency criminal hearings are postponed pending further order of the court. Because of the time-sensitive nature of the relief requested and in accordance with Administrative Order 2020-3, the court rules without holding a hearing on the motion. *See, e.g.*, *United States v. Martin*, --- F. Supp. ---, 2020 WL 1274857, at *3 (D. Md. 2020) (recognizing the Bail Reform Act is silent about whether the defendant is entitled to an in-court hearing after a detention order has issued and declining to grant one in an "endeavor to comply with the federal and State recommendations about avoiding bringing people together in groups larger than ten persons, as well as rule expeditiously").

Minn. Jan. 28, 2009); *United States v. Birbragher*, No. 07-CR-1023-LRR, 2008 WL 2246913, at *1 (N.D. Iowa May 29, 2008). This extends to the current COVID-19 pandemic inasmuch as at least one court has considered the pandemic's impact on counsel's difficulties communicating with the defendant. *See, e.g., United States v. Stephens*, --- F. Supp. 3d ---, 2020 WL 1295155, at *2 (S.D.N.Y. 2020) (finding "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)").

There is limited authority as to when temporary release is justified under § 3142(i) based on "another compelling reason," although a defendant's medical condition may present that compelling reason in a particular case. *See United States v. Rebollo-Andino*, 312 Fed. App'x 346, 348 (1st Cir. 2009) (noting the defendant could seek temporary release under § 3142(i) for medical reasons). Courts have typically granted relief under § 3142(i) only "sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020). As but one example where a court has granted release based on medical issues, the district court in *United States v. Scarpa* permitted the defendant to be released under the 24-hour guard of the United States Marshal Service ("USMS") at his own expense because the defendant had sustained a gunshot wound that destroyed his left eye and surrounding area of his face and skull, he would "shortly die" from terminal AIDS, and correctional authorities could no longer manage his medical conditions. 815 F. Supp. 88 (E.D.N.Y. 1993). In another case, a district court ordered the release of a defendant who had sustained multiple gunshot wounds, was partially paralyzed, could not walk, had lost some arm function, had a wound the size of a fist, and required 4-5 contracted security guards on a daily basis to supervise him; the Bureau of Prisons would not take custody of him because it could not provide the medical care that he required. *United States v. Cordero*

*Caraballo*, 185 F. Supp. 2d 143, 144-47 (D.P.R. 2002). Therefore, Mr. Clark properly seeks relief based on COVID-19 concerns under the "necessary . . . for another compelling reason" prong of § 3142(i).

Other district courts have considered COVID-19 concerns in the context of the more commonly used § 3142(f) pretrial detention framework, including the related subsections § 3142(e)(2)-(3) (statutory rebuttable presumptions) and § 3142(g) (Bail Reform Act factors). For example, the district court in *United States v. Martin* considered the defendant's argument concerning his medical conditions (asthma, high blood pressure, and diabetes) in light of the COVID-19 pandemic in a § 3142(f) analysis. 2020 WL 1274857, at *4. However, the court appears to have considered this issue in the § 3142(f) analysis because the defendant raised the argument in that procedural context. *United States v. Stephens* is another case in which the district court considered speculative COVID-19 concerns—this time, in the context of a motion to reopen detention under § 3142(f) based on a change in circumstances. 2020 WL 1295155 at *2 (reasoning that substantial challenges "would almost certainly arise" *if* there was an outbreak at the Metropolitan Correctional Center in New York City). But the court did not reopen detention based solely on COVID-19 concerns. Rather, the court first relied on new information that weakened the Government's case that the defendant possessed the firearm in question, and thus undermined the court's prior finding as to whether the defendant posed a danger to the community. *Id.* at *1.

A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. The risk of harm *to the defendant* does not usually bear on this analysis. Rather, whether a defendant's particular circumstances

warrant release in light of the COVID-19 pandemic ought to more properly considered on a case-by-case basis under the "another compelling reason" prong of § 3142(i), as the district court did in *Hamilton*, 2020 WL 1323036, at *2. There, the court denied temporary release based on the COVID-19 pandemic where the defendant was of advanced age and suffered from dementia and a history of stroke and heart attack because, among other things, there had been no reported incidents of COVID-19 within the facility where he was being housed and the Bureau of Prisons "is taking system-wide precautions to mitigate the possibility of an infection within its facilities." *Id.* The mere possibility of an outbreak at the facility was not a compelling reason to justify his release. *Id.*

The court is mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents. But, in that context, a defendant should not be entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and speculation. Rather, the court must make an individualized determination as to whether COVID-19 concerns present such a compelling reason in a particular case that temporary release is necessary under § 3142(i). In making that determination, the undersigned will evaluate at least the following factors: (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others. The court will not necessarily weigh these factors equally, but will consider them as a whole to help guide the court's determination as to whether a "compelling reason" exists such that temporary release is "necessary." § 3142(i).

6

### B. The Original Grounds for the Defendant's Pretrial Detention

The court first considers the original grounds for the defendant's pretrial detention. *See Hamilton*, 2020 WL 1323036, at *1-*2 (first considering the rebuttable presumption under § 3142(e) before considering whether the COVID-19 pandemic warranted temporary release under § 3142(i)); *Buswell*, 2013 WL 210899, at *5 (observing that "the facts surrounding the underlying reasons for the defendant's detention are relevant to the [§ 3142(i)] analysis"); *see also Dupree*, 833 F. Supp. 2d at 247 (considering the circumstances leading to the defendant's revocation of pretrial release). After all, if a defendant is seeking temporary release under § 3142(i), the court has already found that pretrial detention was warranted on the grounds that, *e.g.*, no condition or combination of conditions would reasonably assure the defendant would appear as required and/or not pose a risk of harm to others. These reasons should be taken into consideration in determining whether a defendant has presented such compelling reasons for temporary release that they effectively override or at least sufficiently counterbalance the findings that originally justified the pretrial detention order.

In this case, Mr. Clark is a high-risk defendant. The need for pretrial detention is not even a close call. Magistrate Judge Valdez originally ordered him detained pending trial because he was both a risk of flight and a danger to the community. These findings are amply supported by the record. He is the lead defendant named in an indictment where a grand jury found probable cause to believe that he and others were engaged in a drug-trafficking conspiracy case involving substantial quantities of fentanyl and heroin (and derivatives thereof) that resulted in the reasonably foreseeable death of an individual who died as a result of injecting the controlled substances manufactured as part of the conspiracy. He is facing twenty years to life in prison. As such, a rebuttable presumption arises under § 3142(e)(3)(A) that no condition or combination of

7

conditions will reasonably assure his appearance or the safety of any other person or the community.

The evidence against him is strong. The indictment arose from a lengthy federal investigation of large-scale drug trafficking operation in Manhattan, Kansas, and the surrounding area, with ties to Wichita, Kansas City, Topeka, Chicago, and elsewhere. According to the Government's proffers, Mr. Clark is a Chicago-based drug trafficker who is the primary organizer/leader for the drug trafficking organization. (ECF No. 5, at 8.) Search warrants, surveillance, and eyewitness testimony revealed that he would bring drugs from Chicago, often traveling by Amtrak or bus, to the Manhattan area where he would sell them to local distributors and trade them with other co-conspirators for sex. (*Id.* at 14-17.) According to records obtained from law enforcement officers in Chicago, Mr. Clark is a suspected member of the Gangster Disciples Criminal Street Gang that engages in drug trafficking as its primary revenue stream. (*Id.* at 18.) He is forty-three years old and has a violent criminal history spanning nearly his entire adult life. He has been convicted of attempted murder, aggravated battery with a firearm, possession of a firearm, felony unlawful restraint, domestic battery, and felony property damage. (*Id.*) On one prior occasion involving a confrontation with a law enforcement officer, Mr. Clark told the officer that he had been involved with guns and that he would "roll a mother f****r" (understood to mean he would use violent force). (*Id.*)

### C. The Specificity of the Defendant's Stated COVID-19 Concerns

The court turns next to the defendant's stated COVID-19 concerns. Mr. Clark raises legitimate concerns about his underlying health conditions. He is a diabetic. Some people are at higher risk of becoming seriously ill from COVID-19, including those with serious underlying medical conditions such as heart disease, lung disease, and diabetes. *See* CENTERS FOR DISEASE

CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html (last visited Mar. 23, 2020). Citing the CDC's guidance, Mr. Clark misconstrues that this puts him at an increased risk for "contracting" COVID-19. However, there is currently no evidence to support this proposition. *See generally id.* (cited by Mr. Clark and discussing groups at risk for serious complications). "The problem people with diabetes face is primarily a problem of worse outcomes, not greater chance of contracting the virus." AMERICAN DIABETES ASSOCIATION, https://www.diabetes.org/diabetes/treatment-care/planning-sick-days/coronavirus. So it is more accurate to say that *if* Mr. Clark contracts the COVID-19 virus, his diabetes puts him at a "higher risk of getting very sick from this illness." CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html (last visited Mar. 23, 2020). He has therefore established a specific and particular concern that his status as a diabetic puts him at an increased risk for experiencing severe illness if he were to contract COVID-19.

The remainder of his arguments about being incarcerated are general and speculative. Mr. Clark argues that he is at a greater risk of contracting COVID-19 given the lack of opportunity for social distancing at CoreCivic's Leavenworth facility. Unquestionably, avoiding crowds and social distancing are recommended to reduce the risk of transmission. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html (last visited Mar. 20, 2020) (setting forth steps to reduce the risk of transmission); THE PRESIDENT'S CORONAVIRUS GUIDELINES FOR AMERICA: 15 DAYS TO SLOW THE SPREAD, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Mar. 20, 2020) (recommending avoiding social gatherings of ten or more people). But Mr. Clark admits that he is unaware of any known cases of

9

COVID-19 at the facility, and he instead argues that an outbreak is inevitable. (ECF No. 144.) This argument is speculative. The facility is reportedly taking reasonable recommended precautions, including having medical staff screen inmates during intake for COVID-19 risks, isolating those deemed to be high risk, and promoting other recommended hygiene habits. CORECIVIC STATEMENT ON COVID-19 PROTECTION, https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 23, 2020). It is implementing CDC and World Health Organization guidelines, purchasing COVID-19 test kits, communicating best practices for personal hygiene to prevent the spread, encouraging employees to stay home if they are ill, and developing plans to separate high-risk individuals who are more susceptible to COVID-19. *See* CORECIVIC: HOW CORECIVIC IS MANAGING COVID-19 https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 23, 2020). Furthermore, it changed its visitation policies to suspend social visits and minimize in-person legal visits. *See* CORECIVIC: SOCIAL VISITATION SUSPENSION INFORMATION, https://www.corecivic.com/hubfs/_files/Visitation%20Suspension%20Info%20-%20Facility-wide.pdf (last visited Mar. 20, 2020). The court therefore finds his concerns about CoreCivic to be unsupported. *See, e.g.*, *Hamilton*, 2020 WL 1323036, at *2 (denying release where there had been no reported incidents of COVID-19 within the facility where the defendant was being housed and the Bureau of Prisons "is taking system-wide precautions to mitigate the possibility of an infection within its facilities").

The only datapoint Mr. Clark identifies in support of his argument that an outbreak is inevitable is his counsel's representation that she was advised by "medical staff" at CoreCivic that the facility does not have available COVID-19 testing. (ECF No. 144, at 3.) The motion does not

identify the staff member or members or specify when the information was communicated to counsel, leaving the court with no way to evaluate the accuracy or timeliness of the information. But, even if the facility does not have COVID-19 testing available, this is an ongoing problem that is not unique to prison systems. *See, e.g.,* Robert Kuznia, *et al*, SEVERE SHORTAGE OF SWABS AND OTHER SUPPLIES HAMPER CORONAVIRUS TESTING, https://www.cnn.com/2020/03/18/us/coronovirus-testing-supply-shortages-invs/index.html (last visited Mar. 23, 2020). This is a problem in Chicago, too, which is where Mr. Clark proposes to go if he is temporarily released from custody. *See* Angie Leventis Lorgos, *et al.*, ADVOCATE HOSPITALS PAUSE DRIVE-UP CORONAVIRUS TESTING, CITING NATIONAL SHORTAGE OF TEST KITS, Chicago Tribune https://www.chicagotribune.com/coronavirus/ct-coronavirus-testing-suspended-advocate-hospitals-20200320-2kt3g6s3dnho3ctiffx2apg3ky-story.html (last visited Mar. 23, 2020).

In sum, Mr. Clark's diabetes presents a specific COVID-19 risk, but the remainder of his arguments about incarceration are too speculative or generalized to favor release. Mr. Clark cannot predict the extent to which COVID-19 cases might arise at the facility any more than many Americans can predict how they might be exposed to the virus. He also cannot predict how CoreCivic might respond to an outbreak any more accurately than many Americans can predict how their local hospitals might respond. And while inmates may not be able to fully adhere to optimal social distancing guidelines, these circumstances are generalized to all individuals in the prison system and are not unique to Mr. Clark. He is at a facility that has implemented meaningful measures to try to minimize the likelihood of the virus entering the facility.

### D. The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate the Defendant's Overall COVID-19 Risks

The Bail Reform Act allows for temporary release only if the court determines that such release is "necessary" for a compelling reason. 18 U.S.C. § 3142(i). In the context of COVID-19, this means that the proposed temporary release plan should be tailored to mitigate the defendant's overall COVID-19 risks, not exacerbate them. Thus, the court evaluates the extent to which the proposed release plan is tailored to mitigate or exacerbate the defendant's overall COVID-19 risks.

Here, Mr. Clark's proposed release plan addresses only isolated aspects of public health officials' recommendations while ignoring other risk factors that would arise if he were released from custody. Mr. Clark has not set forth a record establishing that, even if someone at the facility were to contract COVID-19, CoreCivic is unprepared to contain the virus or care for those who may become infected. To the contrary, CoreCivic provides around-the-clock medical care, is staffed and trained to contain or treat the virus, and communicates with government partners and health agencies to keep those in its care safe and healthy. *See* CORECIVIC: HOW CORECIVIC IS MANAGING COVID-19, https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 20, 2020). The record is void of any information suggesting that the facility would be unable to render appropriate medical treatment to defendant were he to become ill. Mr. Clark alleges that his blood sugar levels have been high while he is incarcerated, but he provides only conclusory allegations in this regard. He does not provide specifics for the court to evaluate the extent to which the facility (versus Mr. Clark himself) is responsible for not managing his diabetes and/or the extent to which his diabetes is under control. Thus, Mr. Clark's unexplained, conclusory allegations that he may have experienced negative outcomes managing his diabetes at some point

during his incarceration does not rise to the level of justifying temporary release based on COVID-19 concerns.

Mr. Clark also does not address the extent to which his risks could be exacerbated if he returns to Chicago. He proposes home detention with GPS monitoring. However, he offers no evidence to explain how living with his mother mitigates the risk of infection. For example, he does not explain who else has or will live in or frequent the home or identify any screening practices or concrete COVID-19 precautions being taken there. He therefore offers nothing more than speculation that home detention would be less risky than living in close quarters with others at CoreCivic, which at least has screening practices and other reasonable COVID-19 precautions in place. He also does not address the risk of exposure while en route from CoreCivic's Leavenworth facility to Chicago, which is an eight-hour drive during which he and his brother would inevitably have to make occasional stops for necessities. And he does not address, once there, the Chicago health care system's capacity to provide him with adequate treatment if he were to contract the virus. In contrast, if he remains at CoreCivic he has access to around-the-clock medical care, the facility is staffed and trained to contain or treat the virus if necessary, and it collaborates with government partners and health agencies to keep its employees and those in its care safe and healthy. CORECIVIC: HOW CORECIVIC IS MANAGING COVID-19, https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 23, 2020). CoreCivic has ample motivation to prevent any outbreak at the facility and, even if an outbreak occurs, to contain and manage it for the well being of all involved.

On balance, the court is persuaded that this factor is neutral. It is speculative to predict whether Mr. Clark is safer in terms of his overall COVID-19 risks whether he is in custody or temporarily released to live with his mother in Chicago.

13

### E. The Likelihood that the Defendant's Proposed Release Plan Would Increase COVID-19 Risks to Others

In considering temporary release under § 3142(i) based on circumstances related to COVID-19, it is also appropriate to consider the likelihood that the defendant's proposed release plan would increase COVID-19 risks to others, particularly if the defendant is likely to violate conditions of release. A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody.

In this case, these considerations do not support release. Judge Valdez originally detained defendant because he was both a risk of flight and a danger to the community. He is the lead defendant in a drug-trafficking conspiracy case where a grand jury found probable cause to believe that an individual died as a result of injecting the controlled substance manufactured as part of the conspiracy. Given the § 3142(f) and (g) considerations discussed previously, the court believes he will likely violate any conditions of release the court may impose if the court were to issue a temporary-release order. As another court observed:

> [w]hile the location monitoring that he proposed may offer useful information about where he is, it provides little useful information about what he is doing, and the ready accessibility of smart phones and digital communication devices would make it all too easy for him to resume his involvement (directly or through confederates) in the distribution of controlled substances without detection.

*Martin*, 2020 WL 1274857, at *4. Here, Mr. Clark has been unable or unwilling to remain law-abiding for most of his adult life. The court has no reason to believe that he would suddenly become compliant now.

Meanwhile, supervising such a high-risk offender out in the community will place pretrial services officers at heightened risk of contracting the virus. "[L]ocation monitoring is not a limitless resource, nor is its installation and monitoring by the United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing." *Id.* And, when Mr. Clark violates his conditions of release (as he likely will), law enforcement officers will be forced to expend valuable resources during a national crisis to take him back into custody in Chicago and return him to the District of Kansas, both increasing the risk to them of contracting and spreading COVID-19 and further increasing the risk to the prison population when he inevitably returns to the facility. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited Mar. 19, 2020) (urging Americans to consider the risk of travel and noting that travel may put household contacts at an increased risk of contracting the virus). These additional considerations weigh in favor of denying the motion.

### III. CONCLUSION

On balance, Mr. Clark has not established compelling reasons sufficient to persuade the court that temporary release is necessary. He has established only that his status as a diabetic puts him at an increased risk for experiencing severe illness if he were to contract COVID-19. His arguments regarding the risk of an outbreak at his facility is speculative. Furthermore, he has not established that his proposed release plan would necessarily alleviate his overall COVID-19 risks. To the contrary, it appears that, if he were released, he simply would be trading one set of problems (*e.g.*, reduced opportunities for social distancing at CoreCivic) for another set of problems (*e.g.*, contamination risks associated with travel and being in an uncontrolled environment, and

15

potentially reduced access to quality healthcare).  Meanwhile, his proposed release plan would place pretrial services officers at risk in supervising him and, if and when the temporary release inevitably ends (whether because the COVID-19 risks subside or because he violates his bond), it will place the USMS officers at risk in re-apprehending him and the facility at risk when he eventually reenters it after having had abundant opportunity for contamination.  On balance, Mr. Clark has not established a compelling reason that temporary release is necessary.

**IT IS THEREFORE ORDERED** that Defendant Henry Clark's Motion for Temporary Release from Custody (ECF No. 144) is denied.

**IT IS SO ORDERED.**

Dated March 25, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge
