**In the United States District Court
for the District of Kansas**

───────────

No. 19-cr-40068-TC

───────────

UNITED STATES OF AMERICA

v.

HENRY CLARK, ET AL.

───────────

**MEMORANDUM AND ORDER**

Four Defendants in this case—Henry Clark, Sylvester Calvert, Michael Calvert, and James Toliver—each pled guilty to drug distribution conspiracy charges brought under 21 U.S.C. §§ 841(a)(1), 846. Docs. 289, 296, 311 & 317. The Government moved for an upward departure or variance under U.S.S.G. § 5K2.1 for a resulting death. Doc. 370. A three-day evidentiary hearing was held, Docs. 411, 412 & 413, after which the parties filed proposed findings of fact and conclusions of law.[1] For the following reasons, the Government's motion is denied.

**I**

In the summer and fall of 2017, Defendants unlawfully conspired to distribute drugs in the Manhattan, Kansas, area. Clark was the main source of supply for the conspiracy. He resided in Chicago during this period and often traveled to Kansas, where the Calverts and Toliver lived, to facilitate the drug scheme. Indicted coconspirator and

---

[1] As sentencing proceedings are still ongoing for individual defendants, this Order resolves only whether a departure from the Guidelines is warranted under U.S.S.G § 5K2.1. Other sentencing issues and Presentence Report objections will be addressed at the individual sentencings. A separate scheduling Order will follow, directing additional briefing on remaining objections noted in the individual defendant's Presentence Reports.

codefendant Blake Woodyard was a retail-level dealer for the conspiracy.[2] He frequently purchased heroin (or substances that were predominantly heroin or regarded as heroin) from the two Calverts and Toliver; Woodyard did not know, interact with, or buy from Clark.[3] If one of the Calverts or Toliver did not have available product, he would direct Woodyard to the other two. Woodyard also purchased at times from others, including Timmy McGathy, who is believed to have obtained drugs from, among others, Sylvester Calvert and Toliver.[4] Doc. 374 at 8; Doc. 375 at 8; *see also* Doc. 424 at 104; Gov. Ex. 29. Evidently, Woodyard purchased from these men (and possibly others) indiscriminately, primarily driven by price, availability, and convenience. But by late summer 2017, he favored Defendants almost exclusively. Doc. 439 at 9, ¶ 32; Doc. 424 at 20–22; 47–48. He essentially operated as a middleman: buying heroin, reselling it at a higher price, and using the difference to finance his personal heroin consumption. Doc. 424 at 9–19.

On September 25, 2017, a Kansas State University student, referred to here as MFD, contacted Woodyard to buy heroin. *See* Gov. Ex. 21. Phone records show that shortly after, Woodyard made phone calls to Toliver, as well as two of Woodyard's regular customers. *See* Gov. Ex. 24. Later that night or the next day, Woodyard sent a SnapChat message to MFD asking, "You like that." *See* Gov. Ex. 21.

The next day, law enforcement found MFD dead from an apparent overdose. Investigators found several pill containers, powdery substances, small plastic bags, and other drug paraphernalia. *See* Gov. Exs. 6 & 7; Def. Ex. 305. Heroin and acryl fentanyl were detected on two pieces of plastic. Doc. 422 at 158–59; Gov. Ex. 12. Another piece of plastic, still tied and containing a white/gray substance, was tested but

---

[2] Woodyard is currently awaiting trial. He testified at the evidentiary hearing for this motion as a cooperating witness for the Government. Doc. 424 at 5–6. He hopes to receive some consideration for his cooperation and signed a proffer agreement that the information he provided would not be used against him if he told the truth. *Id.*

[3] For simplicity, this Order refers to "Defendants" to mean the four defendants named in the introduction and implicated in the Government's motion: Henry Clark, Sylvester Calvert, Michael Calvert, and James Toliver.

[4] McGathy has since died, but had been cooperating with the Government's investigation. *See* Doc. 424 at 134–37. Toliver's plea agreement, as well as evidence from the hearing, indicate that McGathy had been involved with Defendants to some extent. *See* Doc. 317 at 2; Gov. Ex. 24; Doc. 424 at 134–37; Doc. 439 at 42.

did not contain a controlled substance. Doc. 422 at 159; Gov. Ex. 13. Fentanyl was detected on a piece of straw. Doc. 422 at 159; Gov. Ex. 13; *see* Gov. Ex. 7.

Defendants pled guilty to drug-distribution conspiracy charges, 21 U.S.C. § 846, based on conduct in violation of 21 U.S.C. § 841(a). *See also id.* at § 841(b)(1)(C) (providing statutory minimum and maximum penalties).[5] Each Defendant, in his plea agreement, admitted to certain facts constituting the offense. Docs. 289, 296, 311 & 317. Among these are that: (i) he agreed with the others to distribute controlled substances, including mixtures and substances containing heroin or fentanyl; (ii) the object of the conspiracy was to distribute for personal gain; and (iii) the conspiracy was interdependent in that the defendant obtained heroin or fentanyl from others in the conspiracy to resell to other persons.

The dispute in this motion centers on the cause of MFD's death and whether it is attributable to Defendants for sentencing purposes. The Government's theory is straightforward: when a "retail customer uses and dies from the drugs received, all members of that conspiracy can be held liable for the death." Doc. 434 at 2. Defendants dispute this chain-of-causation argument. They point to testimony and reports indicating that MFD died from a pure fentanyl overdose—not heroin or any heroin mixture—since no heroin metabolites were found in his body. Defendants link this fact with the substantial evidence that Defendants dealt only in heroin—or heroin and fentanyl mixtures—not pure fentanyl. In other words, they argue that MFD did not die from their drugs or their drug scheme.

## II

The Government's motion for an upward departure or variance is denied. The record presented fails to establish by a preponderance of the evidence that MFD's death resulted from Defendants' conduct within the meaning of U.S.S.G. § 5K2.1.

## A

As an initial matter, district judges are not bound to impose sentences within the ranges established by the Sentencing Guidelines.

---

[5] 21 U.S.C. § 841(b)(1)(C) also provides for mandatory minimum sentences where death or serious bodily injury results. That statutory enhancement is not at issue in the Government's motion. Doc. 434 at 33.

*Peugh v. United States*, 569 U.S. 530, 536–37 (2013). In that sense, the Guidelines are advisory, not mandatory. That said, judges must consult the Guidelines as a starting point and correctly calculate the applicable ranges. *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Whether a sentence ultimately falls within or without the Guidelines range, the district court "must explain the basis for its chosen sentence on the record." *Id.*

The Government seeks an upward departure from the Guidelines ranges. Although the particular ranges in this case have yet to be determined, whether a departure is warranted may be decided now. U.S.S.G. § 5K2.1 permits a court to increase a sentence above the Guidelines range "if death resulted" from the defendant's conduct. The section then lists factors to consider when deciding the extent of any departure. *See United States v. Montgomery*, 550 F.3d 1229, 1234 (10th Cir. 2008). Naturally then, the threshold inquiry for a departure under U.S.S.G § 5K2.1 (and the Government's motion) is whether MFD's death *resulted* from Defendants' conduct. If not, there is no need to weigh factors relevant to the extent of a departure. Thus, this preliminary question may be resolved now, even though individual Guidelines ranges and other sentencing objections remain pending.[6]

The Government must prove a causal connection between the crime and the death by a preponderance of the evidence. *See United States v. Munoz-Tello*, 531 F.3d 1174, 1181 n.12 (10th Cir. 2008); *United States v. McCray*, 7 F.4th 40, 49 (2d Cir. 2021) (preponderance of the evidence); *United States v. Nossan*, 647 F.3d 822, 826 (8th Cir. 2011) (same). The Tenth Circuit has looked to whether a defendant's conduct was a "link in the chain of events" leading to the death, coupled with "whether [the possibility of death] was reasonably foreseeable" in light of the "the inherently dangerous nature" of the offense. *United States v. Montgomery*, 550 F.3d 1229, 1236 (10th Cir. 2008); *see also United States v. Purchess*, 107 F.3d 1261, 1270–71 (7th Cir. 1997).

**B**

The weight of the evidence does not merit an upward departure under U.S.S.G. § 5K2.1. This determination follows from two

---

[6] Presentence Investigation Reports (and objections, including to this death enhancement) have been filed for each Defendant. Docs. 372, 373, 374 & 375.

questions: What caused MFD's death? And is that cause attributable to Defendants?

**1.** The evidence supports the conclusion that the decedent died from fentanyl poisoning. Dr. Michael Handler, a board-certified pathologist, performed the autopsy and reviewed the toxicology report based on a sample of MFD's femoral blood.[7] Doc. 434 at 7. Handler determined the cause of death as "acetyl fentanyl overdose," noting that it was "not a difficult conclusion." *Id.* at 111–12.

According to Handler, there was no evidence to suggest that MFD had consumed heroin. Doc. 422 at 118. Neither heroin nor heroin metabolites (byproducts of a substance as it is metabolized) were found in MFD's blood. *Id.* at 126. Handler opined that if MFD had taken heroin around the same time as fentanyl, then it would be expected that heroin metabolites would be found in his blood because heroin and fentanyl metabolize at similar rates. *Id.* at 125–26. Handler therefore concluded that whatever substance MFD ingested did not include heroin. *Id.* at 126–27 (noting that in overdose autopsies, a combination of heroin and fentanyl is commonly seen). Dr. Stacey Hail, board certified in medical toxicology and retained by the Government as an expert witness, reviewed the case and agreed that the fentanyl/acetyl fentanyl mixture was the but-for cause of MFD's death. Doc. 423 at 163. In all, there was no evidence or testimony suggesting that MFD had ingested heroin.

**2.** The evidence does not establish that the fentanyl taken by MFD is traceable to Defendants' scheme or conduct for the purposes of U.S.S.G. § 5K2.1. On the contrary, the evidence is insufficient to show that Defendants provided the fentanyl that killed MFD.

The record establishes that Woodyard is the only link that connects Defendants' drug distribution activities to MFD. In other words, no evidence suggests that Defendants directly provided drugs to MFD or that anyone other than Woodyard distributed Defendants' drugs to MFD. Instead, the testimony and evidence demonstrate that MFD contacted Woodyard through SnapChat seeking heroin. Gov. Exs. 21 & 23. Soon after these messages, Woodyard called several other people

---

[7] Paul Miller, a retired biochemist who worked for National Medical Services, certified the toxicology tests and described the process used. Doc. 422 at 134–42. Femoral blood is the preferred specimen because it is less subject to postmortem redistribution effects from surrounding tissue, which can alter chemical concentrations in the blood. Doc. 422 at 110.

5

on the phone, including Toliver. Alhough Woodyard did not deny that the SnapChat exhibits indicate that he communicated with MFD about providing heroin, he could not recall who MFD was, who his suppliers were on that particular day, or even whether he provided any drugs to MFD. Still, given the messages, it is fair to conclude for purposes of this motion, as investigators had, *see* Doc. 424 at 171, that Woodyard likely sought heroin for MFD and delivered illicit narcotics to MFD on the night of his death.

But the record does not establish with sufficient certainty that Defendants provided Woodyard with the pure fentanyl that killed MFD. Simply because Woodyard tried to contact one supplier, Toliver, after MFD asked to buy heroin does not prove that Toliver sold Woodyard anything, much less pure fentanyl. Nor does it establish that Woodyard, in turn, provided pure fentanyl to MFD. The Government's timeline shows that interspersed with his calls to Toliver, Woodyard called two of his own regular customers, Michael Wagner and Mario Corono. Gov. Ex. 24. Moreover, Woodyard often obtained heroin for himself multiple times in a day, and Defendants were not his only sources for heroin. Doc. 424 at 16–17, 21. The call to Toliver could suggest that Toliver supplied Woodyard with something (maybe even fentanyl-laced heroin), but it does not establish a sufficient link between Toliver and the pure fentanyl that killed MFD.

The Government's evidence does suggest that Woodyard believed he was responsible for MFD's death. Testimony established that when law enforcement first spoke to Woodyard about MFD's death, Woodyard immediately wept in a way that caused them to believe that Woodyard recognized the gravity of his actions. And Sergeant Dierks, who was involved with the investigation, testified that one of MFD's friends told Dierks he had confronted Woodyard about the "white China" (a street term for heroin) after MFD's death. According to the friend, Woodyard responded with something like an apology. *Id.* at 132–33. But there are no text messages or records of that confrontation, the friend did not testify, and Dierks did not recall exactly what the friend had said.

But even accepting that Woodyard had a guilty conscience, that still does not link Defendants to the pure fentanyl in MFD's system. There is no evidence that Defendants ever sold pure fentanyl. At all relevant times, Woodyard's drug of choice was heroin or "China

6

White," and that is what he seemed to offer MFD.[8] Doc. 424 at 7, 25, 34, 66. His primary suppliers were three of the Defendants. *Id.* at 28–29. Woodyard testified that the potency of particular doses he obtained from Defendants sometimes differed, but that it always felt like a heroin high. *Id.* at 50–51. To his knowledge, he never purchased or sold pure fentanyl from Defendants. *Id.* at 63, 67. This does not, of course, rule out the possibility that heroin he obtained from Defendants might sometimes have had fentanyl mixed in. *See id.* at 81–82. Indeed, the varying potency Woodyard described suggests that may have been the case. But the testimony suggests that heroin was still present in the drugs Defendants supplied to Woodyard.

Woodyard's personal experience with drugs he obtained from Defendants is consistent with evidence obtained through law enforcement's "controlled buys." Throughout 2017 and into early 2018, investigators arranged for 10 purchases from Defendants and two purchases from Woodyard. *See* Doc. 434 at 11–12. Law enforcement tested the product obtained after each buy. Heroin was detected in every sample tested. Some contained pure heroin and others contained heroin mixed with fentanyl or acetyl fentanyl—but all contained heroin.

The Government points to two other controlled buys in September 2017 that did contain only fentanyl without heroin. Doc. 434 at 11; Doc. 439 at 42. But these were purchased from McGathy, not Defendants or Woodyard. McGathy was known not only to sell directly to Woodyard, but also to have multiple sources of supply in addition to, and other than, Defendants. *See* Doc. 424 at 154–55.

The totality of the evidence raises substantial doubt about whether the fentanyl that caused MFD's death was obtained from Defendants. It is *possible* that Defendants provided the pure fentanyl that McGathy distributed in the controlled buys and that, on the night in question, one of them supplied pure fentanyl to MFD via Woodyard. But the upward departure that the Government seeks may not rest on a mere

---

[8] Woodyard had transitioned to using and selling heroin from his initial use and sale of "blue pills" (some form of opiate). Doc. 424 at 35. He testified that there was only a short period of time when he sold both heroin and blue pills, but that he began to deal only heroin in early 2017. *Id.* When Woodyard was arrested in January 2018, his wallet contained a small package of a powdery substance that was determined to be fentanyl. Doc. 424 at 129–30; Gov. Ex. 50. Woodyard testified that he did not remember seeing the package or being aware of it at the time. Doc. 424 at 42–43. Similarly, there is no information about where he purchased the pure fentanyl and no suggestion that Defendants sold it to him.

possibility. Rather, the inquiry here is about what likely happened. *See Munoz-Tello*, 531 F.3d at 1181 n.12; *McCray*, 7 F.4th at 49 (preponderance of the evidence); *Nossan*, 647 F.3d at 826 (same). The evidence presented fails to establish that Defendants likely provided the pure fentanyl that killed MFD so as to justify application of § 5K2.1.[9]

\* \* \*

In sum, MFD died from a fentanyl overdose, and no heroin metabolites were found in his system. There is no evidence that Defendants sold pure fentanyl. To the extent that they did incorporate fentanyl into their product, the evidence shows that there was always heroin present as well. Thus, on the record presented, the Court finds that MFD's death did not result from Defendants' scheme for the purposes of U.S.S.G. § 5K2.1. And, even if could be attributed to Defendants' conduct, the evidence presented was not of the type or quality that would warrant exercising the Court's significant discretion to depart upward under the Sentencing Guidelines or 18 U.S.C. § 3553.

### III

For the reasons set forth above, the Government's motion for an upward departure or variance, Doc. 370, is denied.

It is so ordered.

Date: August 8, 2022          s/Toby Crouse
                              Toby Crouse
                              United States District Judge

---

[9] One can easily imagine a different set of facts. If the autopsy, toxicology report, and expert opinions all confirmed that heroin or heroin metabolites were present in MFD at the time of his death, this outcome might well be different. For example, contrast this case to one where the only drugs present near the decedent were drugs reasonably assumed to come from the defendant(s), and the decedent had died from similarly composed drugs. *See Nossan*, 647 F.3d at 826 (affirming upward departure and noting that heroin was both at the scene and present in decedent and that defendants dealt heroin).